# CHARLESTON.

## MILLER v. LORENTZ et al.

Submitted January 22, 1894.—Decided March 28, 1894.

1. STATUTE OF FRAUDS—PAYMENT—VENDOR AND VENDEE.

In the case of a verbal contract for the sale of land the payment of the purchase-money is not of itself such performance, as will take the case out of the statute of frauds, although the vendor has become insolvent.

2. SPECIFIC PERFORMANCE—VENDOR AND VENDEE.

Where the general requisites for a decree for specific performance are shown, possession given and taken in part execution of such verbal contract may of itself entitle the purchaser to have the same enforced; but such possession must be actual and exclusive, and be retained and continued under it; and such contract must be satisfactorily proved, and be certain and definite in its terms.

3. SPECIFIC PERFORMANCE—EQUITABLE ESTOPPEL—VENDOR AND VENDEE.

This rests upon the principle of equitable estoppel, that the vendor has so dealt with the purchaser in receiving the whole or a part of the purchase-money or in contracting for its payment, and in putting him in actual possession of the land in part execution of the contract of sale, that it would be a fraud on the vendor's part to repudiate the contract and stop short of its complete execution.

A. EDMISTON and W. W. BRANNON for appellant cited 31 W. Va. 9; 6 W. Va. 251; 6 Rand. 681; Fry Spec. Perf. §§ 403, 404; 5 Munf. 308; 3 Pom. Eq. Juris. 456; 2 Min. Inst. 773–775; 7 Waite Act. & Def. 25; 10 W. Va. 12; 6 W. Va. 747; 5 Laws. R. R. & P. §§ 2614, 2615; 12 Leigh, 70, 79, 84; Bar. Ch'y Pr. 120; 2 Lom. Dig. 95, 100; 23 W. Va. 107; 21 W. Va. 481; 36 W. Va. 350.

L. BENNETT, for appellees :

I.—*Retaking depositions.*—29 W. Va. 263, 2 Syl.; 17 Gratt. 187 ; 4 Monr. R. 280; 1 Beasley's R. 108.

II.—*Removal of cloud.*—21 Conn. 488.

III.—*Equity jurisdiction over statutes of frauds and application*

*to case at bar.*—Brown Stat. Frauds, §§ 437, 448; 2 Min. Inst. 903, 909, 4 n.; Sto. Eq. Jur. § 759; 17 W. Va. 336; 31 W. Va. 9; 20 W. Va. 394, 404.

IV.—*Nature and extent of proof requisite.*—9 Wall. 1; 1 Young & Collyer, Ch'y R 147; 53 Pa. 332; 6 W. Va. 256; Code W. Va., c. 125, s. 59; 51 Pa. St. 51.

V.—*Questions relating to possession.*—1 Sands Ch'y 46; 1 McCord Eq. 32; Hoff Ch'y 470; 9 Watts 106; 1 Gratt. 211; 31 W. Va. 14; 6 Watts 464; 37 W. Va. 776; 36 W. Va. 71 (2) 72 (5); 1 Gratt. 207 (bottom.)

VI.—*Laches not applicable where vendee is in possession.*—3 Jones (N. C.) Eq. 84; 3 Paige (N. Y.) 446; 2 Lom. Dig. 103; 2 Scho. & Sufr. 604; 10 W. Va. 677, Syl. 6; 10 Wright 537; 2 B. Mon. 196; 3 Edw. 213; 12 Allen; White and Tudor's Lead. Cas. Eq. part 2, 4th Am. Ed. p. 1137; 32 W. Va. 479, 480.

HOLT, JUDGE:

This is a suit in equity to enforce the specific execution of a parol contract for the sale of land, brought on the 7th day of March, 1889, in the Circuit Court of Lewis county, by James W. Miller, against Maggie Lorentz, as heir at law of Perry C. Lorentz, plaintiff's vendor, and against Nathan Allman, vendee and grantee of the said Maggie Lorentz. Maggie Lorentz, by deed dated November 5, 1888, had sold and conveyed said land by metes and bounds as containing twenty six acres to defendant Nathan Allman. The court by decree pronounced on the 24th day of October, 1892, decreed that Lafayette L. Lorentz, devisee of defendant Maggie Lorentz, who had died pending the suit, and defendant Nathan Allman should convey the twenty six acres in controversy to plaintiff within sixty days and in default of such conveyance that a special commissioner should make such deed of conveyance; and from this decree L. L. Lorentz and Nathan Allman have obtained this appeal.

Plaintiff alleges in his bill, that in 1875 and before that time the said Perry Lorentz owned and possessed a certain tract of land situate partly in the county of Lewis and partly in the county of Upshur, bounded by the land of

plaintiff, the land of William Bargerhoff, the land of William Bartlett (now owned by John Bells) the land of Barnes Bartlett (now owned by John S. Reger) and by the Staunton and Parkersburg turnpike ; that on the —— day of ——, 1875, the said Perry Lorentz sold to plaintiff by verbal contract the said tract of land bounded as aforesaid at the price of two dollars per acre ; and that plaintiff at once took actual possession of said land under said purchase and has ever since held the same in actual, continuous, notorious and exclusive possession ; that at the time of the sale the quantity of land sold was not known, but plaintiff paid at the time of the purchase fifty dollars, and afterwards under mistake as to the quantity paid Perry Lorentz seventeen dollars and seventy five cents on the 26th day of August, 1876, and thirty dollars about the same time, which turned out to be in excess of the price agreed to be paid for the land ; that some time afterwards plaintiff had the same surveyed, and found it to contain seventeen and a half acres, and delivered the plat of the survey to said Lorentz for him to make a deed to plaintiff for the land ; that Perry Lorentz always recognized the validity of the sale, which was a verbal one, but neglected to convey the land to plaintiff by proper deed, which at the time of the sale and repeatedly afterwards he promised to make ; but on the 4th day of July, 1887, he departed this life intestate and insolvent, leaving defendant Maggie Lorentz his sole heir ; that, notwithstanding plaintiff's said purchase and possession of the land were well known to both Maggie Lorentz and defendant Nathan Allman, the said Maggie refused to convey the same to plaintiff, but instead thereof sold and conveyed the same to defendant, Allman by deed dated November 5, 1888, recorded in Upshur county ; that the twenty six acres thus sold and conveyed to Allman include in addition to said seventeen and a half acres, eight and a half acres of plaintiff's contiguous tract of one hundred and eighty five acres. which was conveyed to the plaintiff by Jacob Bush and wife by deed dated 12th March, 1859, which is part of a tract of two hundred and twenty eight acres, which was sold and conveyed by Perry Lorentz to said Jacob Bush by deed dated April 4, 1857 ; and that

plaintiff has held said tract of one hundred and eighty five acres in actual possession under his deed from Bush continuously since March 12, 1859; that the land thus bought by plaintiff from Perry Lorentz runs with a line of plaintiff's tract of one hundred and eighty five acres as a part of its boundary; that it is chiefly valuable for its timber; that defendant Allman has entered upon it, although it is in plaintiff's actual possession, and is cutting and removing the timber; that Allman's deed for twenty six acres is a cloud upon plaintiff's title to that part included in it, bought by plaintiff of Jacob Bush, as well as the part bought of Perry Lorentz.

Plaintiff prays that defendant Maggie Lorentz may be required to convey to plaintiff by proper deed the land purchased by plaintiff of her father, Perry Lorentz, or, in default on her part that a commissioner may be appointed and directed to so convey it in her name and stead; that he may have a decree against the estate of Perry Lorentz for the excess of purchase-money so paid by plaintif to Perry Lorentz for said land; that said deed from Maggie Lorentz to defendant Allman may be declared null and void so far as it affects the right and title of plaintiff to said two tracts, or either of them; that defendant Allman be perpetually enjoined from cutting and removing timber from and other trespasses on the said land; and for general relief, *etc.*

On the 27th day of March, 1889, the injunction prayed for was awarded until further orders.

The defendant Maggie Lorentz filed her answer and supplemental answer duly verified by her oath, in which she admits that the land in controversy belonged to her father; that he departed this life leaving her his sole heir at law; that she sold and conveyed the twenty six acres to the defendant Allman for a valuable consideration, as she had a perfect right to do; that the land thus conveyed does not lap or encroach upon the boundaries of plaintiff's land, bought of Jacob Bush; that plaintiff never bought it of Perry Lorentz in any way, never paid any purchase-money, never had any actual possession; and she pleads and relies upon the statute of frauds and perjuries, upon the statute of limitations, and upon the plaintiff's laches; denying

specifically and definitely all plaintiff's allegations of claim for specific execution.

Defendant Allman filed his answer of the same tenor and effect, denying specifically each allegation, and especially that plaintiff was ever in possession of said land under any contract of purchase from Perry Lorentz; and he denies that he ever had any notice or knowledge of plaintiff's claim, until after he had been put in possession thereof under said sale and deed to him from defendant Maggie Lorentz; and that he is and was a purchaser for value without notice. He also pleads and relies upon the statute of limitations, plaintiff's laches, and the statute for the prevention of frauds and perjuries, *etc.*, and he swears to his answer.

Defendant Post, sheriff of Lewis county and as such administrator of Perry Lorentz, deceased, answers that decedent left no personal estate; that none ever came to his hands to be administered; pleads the statute of limitations; denies each and every allegation, and calls for full proof.

Defendant Maggie Lorentz departed this life before decree, and on *scire facias* the suit was revived against defendant L. L. Lorentz, her executor and sole devisee.

Plaintiff took the depositions of eighteen witnesses, defendants the depositions of twenty witnesses, and, the cause coming on to be heard on the 24th day of October, 1892, the Circuit Court pronounced in favor of plaintiff the decree for the specific execution of his contract of purchase, already mentioned as appealed from.

A party injured by breach of an agreement to convey a certain tract of land may at his election have either of two remedies: He may bring an action at common-law, and recover damages for the injury; or he may bring his bill in equity, and compel the vendor to perform the agreement specifically; and it is understood to be performed specifically when the parties are put into the state in which they would have been if the agreement had been punctually performed. As the common-law can only award a compensation in damages, which is not regarded as commensurate with the loss of the particular tract of land, such remedy is not adequate; hence the jurisdiction of a court of equity. See *Rose* v. *Nicholas* (1794) Wythe 59.

Such contracts, having the essential requisites, are enforced as a matter of course. This jurisdiction, evidently borrowed by the early chancellors from the Roman law, can be traced back by cases adjudged to the year 1362 (35 Edw. III.) when Lady Audley sued her father-in-law, and was decreed specific execution of a covenant of marriage settlement, and protection of her separate estate. 1 Pom. Eq. Jur. (2d Ed.) § 35, note. See 22 Am. & Eng. Enc. Law, 910. No doubt, then, as now, its jurisdiction, based upon the principle of equity and good conscience, its flexibility of procedure, and the deficiencies of the common-law not curable save by statute, was the slow growth of time and circumstances; and such it must to some extent continue to be, or lose its chief efficacy. This has so far kept it practically distinct as to the remedies administered, although the formal distinctions between it and the common-law proper have long been abolished, where the methods of administering justice are the most advanced; but it still represents the formative, growing branch of the law, independent of statutory enactment.

Littleton's Tenures were composed in 1475 and printed in 1481; but the common mode of conveying lands had long been by livery of seisin, that is, by going upon the land and in the presence of the neighbors called together as witnesses with apt words to designate the form of the gift making livery of seisin, visible transfer, actual investiture in the donee of the ownership of a freehold estate (in strictness an estate of inheritance) in the land by a delivery of the actual possession of the land itself, accompained generally by the deed or charter of feoffment; not, however, as the efficient or as a necessary part of the gift, but only as a certain and lasting memorial of what had been done. It was a transfer of ownership of land effected and evidenced by a delivery of possession; and a delivery of possession of goods chattels is to this day the transfer and the evidence of the transfer of the ownership to the buyer. Without such livery of seisin, transfer of ownership by such solemn delivery of possession, the gift would be in one sense but a mere naked executory promise, yet the possession itself is regarded and protected as a species of

property. A feofment, considered simply and solely, is the livery of the seisin. (Challis, Real Prop. 321.) It was the only common-law assurance (not being matter of record, as a fine or recovery) by which legal estates of freehold in possession could be conveyed to a person having no subsisting interest in the land, and no privity with the person making the assurance. (*Id.*)

It has hong been our statute law that "all real estate shall, as regards the conveyance of the immediate freehold thereof, be deemed to lie in grant as well as in livery" (Code c. 71, s. 4); and that "no estate of inheritance or freehold, or for a term of more than five years in lands, shall be conveyed, unless by deed or will" (Code c. 71, s. 1) and such deed must now be signed as well as sealed and delivered.

Although such livery of seisin may have been generally followed by the continuous holding of actual possession, in the modern sense, on the part of the donee by himself or by his tenant, yet it was not necessary to its validity; and his seisin continued until disseisin. Still the livery of seisin operated as an estoppel *in pais* against the donor (Co. Litt. 352a; 1 Gilb. Ev. 76) for it was a ceremony had on the land itself, which put in the strongest light and with the greatest notoriety an owner who had title by visible dominion, transferring to and vesting in the donee such title by visible dominion, making livery of seisin of the ownership of a freeleld estate held by the title of such visible dominion, by means of a transfer of the possession of the land itself, which had the effect of investing the donee with such ownership, so created, and evidenced by such title. (See Roberts, Frauds, 261 *et seq.*)

But, as time went on, sales of real estate became frequent, and livery of *seisin* quite common. Under a great change of circumstances relaxations of the ancient form followed, until there scarcely remained a vestige of the original ceremony. (Browne, Stat. Frauds, 4th Ed., 4). The use|of the old solemnities before the men of the country had ceased by allowing secret liveries in the presence of any two witnesses. (1 Gilb. Ev. 76.) The customary deed or charter of feoffment, as we have seen, was never indispensable;

and down to the time of the statute of frauds (24th June, 1677) the ownership of a freehold estate in land could be transferred by livery of seisin, loose and informal as that ceremony had become; and consequently great danger was incurred of such transfers being attempted to be proved by false and fraudulent means." (*Id.*)

Then came the troublous times, the confusion of rights and possessions incident to the commonwealth and the restoration. The English statute of frauds and perjuries (29 Car. II. c. 3) was enacted in 1676 by its terms to take effect from and after the 24th day of June, 1677. The first two lines contain the motive of the enactment, the mischief to be suppressed: "For prevention of many fraudulent practices which are commonly endeavored to be upheld by perjury and subornation of perjury be it enacted," *etc.* It did not become the law of Virginia until it was substantially re-enacted by the legislature of the state on the 30th day of November, 1785. (See 1 Rev. Code 1819, p. 372.)

The first charter of Virginia was granted on the 10th day of April, 1606, the fourth year of James I., and it is only English statutes in force before that date that were saved as operative without special enactment. (Code, c. 13, s. 6.) It passed through the various revisals of 1819, 1849 and 1868 with slight verbal changes. The first part is now found as section 1 of chapter 71, and the fourth section of chapter 98. (See Code, p. 715). Actual possession was still *prima facie* evidence of ownership in fee, and it was not the purpose of the statute to weaken or disparage it, or to dispense with the delivery of possession in many cases, but to provide a certain and stable memorial of the transaction; in other words, making the deed of feoffment, or some writing signed by the parties, essential to the creation of the estates mentioned.

It is said that "even before the statute of frauds equity would not execute a mere parol agreement not in part performed." 1 Sugd. Vend. (14th Eng. 8th Am. Ed.) top p. 230. For a review of the English cases beginning with the statute, see Roberts Frauds (3d Am. Ed. 1833) 130 *et seq.;* 2 Com. Dig. 484. In such cases, for example, where the purchase-money had been paid, and the possession had

been given and taken in part performance of a verbal contract clearly proved, the contract was fully executed on the part of the purchaser, and substantially executed on the part of the vendor. It only needed some certain and stable memorial to make it in every sense complete. Such as would have existed had there been a formal livery of seisin and deed of feoffment. Such cases were soon after the statute hardly considered within its meaning and did not need to be taken out of it, but were put on the ground of estoppel against the perpetration of a fraud. In *Butcher* v. *Stapely,* 1 Vern. 363, decided in 1685, "The lord chancellor declared that, inasmuch as possession was delivered according to the agreement, he took the bargain to be executed;" and the doctrine was rested upon the ground that the vendor was in such case estopped from the perpetration of a fraud under cover of the statute by conveying to another or refusing to complete the sale of the land.

The importance at common-law, as well as natural significance of that kind of part performance, was never lost sight of, and so it remains to this day; for it is easy to find non-relievable cases, in which the whole or a good part of the purchase-money has been paid, but possession has not been taken, in which the vendor taking shelter behind the statute perpetrates a more serious fraud than would result from the purchaser having to return the possession. Therefore the general doctrine would seem to rest upon estoppel against committing a fraud, where the part performance is such as makes a visible transfer of the ownership pointing unmistakably to some contract, as well as to the vital point of its execution in the transfer of the possession of the land, the value of which generally consists in its use and enjoyment, and which puts the purchaser in the position of *prima facie* owner, and being notice of his claim to all subsequent purchasers. See Roberts, Frauds, preface, p. 261 *et seq.;* Browne, St. Frauds, § 467 *et seq.;* Pom. Cont. § 104 *et seq.;* Fry, Spec. Perf. § 384; Wat. Spec. Perf. § 257 *et seq.;* 2 Story, Eq. Jur. (13th Ed.) § 764; Brett's Lead. Cas. 134; Beach, Mod. Eq. Jur. § 613; Bisp. Eq. § 385; 8 Am. & Eng. Enc. Law, 737; 22 Am. & Eng. Enc. Law, 975.

I confess I do not appreciate the importance of insisting on the distinction between the purchaser taking and the vendor delivering the possession, for, to be efficient, it must be their conjoint act. The vendor can not effectively deliver the possession unless the purchaser accepts it, and the purchaser can not effectively take it without the knowledge and consent of the vendor. It is the conjoint act—the giving and taking in part performance—that makes it so important a factor in the transaction; and, but for the authorities, which insist on treating it from the standpoint of part performance on the part of the plaintiff, I should think it just as significant and appropriate to the relief sought, and less strained and artificial, for the purchaser in many cases to allege that in part performance the vendor delivered to him the possession, than to allege that he took possession in part performance. In truth it is the giving as well as the taking that gives the act in part performance of a sale, in view of its character and significance, so much importance. The case of *Butcher* v. *Stapely*, cited above, treats the act of part performance which creates the equity as the possession delivered by the defendant-vendor to the plaintiff, the purchaser; that is, the purchaser has been put by the vendor into the possession of the land, and the purchaser has fully or in good part performed the contract on his part by payment of all or a part of the purchase-money, which condition of affairs makes it against conscience in the vendor to insist on the want of a writing (so signed) as a bar to his relief. See *Clinan* v. *Cook,* 1 Sch. & Lf. 22, 41 ; *Bond* v. *Hopkins, Id.* 433.

Suppose a verbal contract, certain and definite in all its terms, is proved or admitted, the purchaser has paid all the purchase-money, and the vendor, in part performance, has put the purchaser in actual possession, and is to convey the property as soon as it can be conveniently done, but afterwards declines to do so, and relies upon the statute of frauds. The payment of the purchase-money was full performance on the part of the purchaser. It was all he had to do. The delivery of the possession and the conveyance were the things to be performed by the vendor. He

performs it in part,—that is, he puts the purchaser in possession—but there stops relying on the statute.

Equity treats such conduct as against conscience as a fraud, and applies to him the doctrine of equitable estoppel. He is estopped by his own conduct, by receiving the purchase-money and delivering the possession, from refusing to complete it; and the fraud can not be compensated in damages, because it is a refusal by the vendor to complete a sale of a specific tract of land. The transfer of possession is the historical as well as natural mode, and, in any event, the usual concomitant of the transfer of the ownership, as well as of personal property, for the plain reason that it gives the vendee power and dominion over it, and is visible evidence of a right. He is *prima facie* owner in fee against all persons except the vendor, supposed to be the former true owner. He is not required to show how he came by such possession. And, when such demand of the former owner is made in a court of equity, he meets it by showing that he was put there by the demandant himself in part execution of a definite and certain contract of sale voidable, it is true, because verbal, but none the less provable for the occasion; and thus the vendee has justified as well as explained his attitude in relation to the land.

1. It was not necessary for him to sign any writing, even had there been one. He may have fully performed the contract on his part by payment of all the purchase-money. In any event he must complete the payment as a condition precedent to the vendor's conveyance.

2. The vendor partly performed his part of the contract by delivery of possession or consenting to the vendee's taking it, which for this purpose is the same thing. The act is conjoint, no matter from what standpoint we view it.

3. It was therefore no longer a mere executory contract (a chose in action against the vendor) but had created, as distinguished from it, a right of property in the land which the law recognizes and protects (some sort of equitable right or interest in a particular tract of land); and the vendee was also apparent owner, at least; and in pursuance

of the contract, as distinguished from its part execution by the vendor, the vendee may have made improvements.

4. Having gone thus far, it would be a fraud on the part of the vendor to repudiate the verbal contract, or stop short of its complete execution.

5. And the injury resulting from such fraud is not compensable in damages, because it is a sale of a particular tract of land.

6. It is not within the mischief of the statute, because, from the visible nature of such part performance by delivery of possession of such a thing as land, it points unequivocally to some contract; and the certain and definite verbal contract, clearly proved, shows it to be a contract of sale (or lease).

7. Therefore the doctrine of equitable estoppel applies, defensive in its nature, it is true; but to be available at all, must be asserted affirmatively.

8. The vendor has so dealt with the vendee in making the verbal contract, receiving all or a part of the purchase-money, in putting the vendee in actual posssession of the land in part execution on his part of such contract of sale, that it would be a fraud for him to repudiate it, and stop short of its complete execution. This fraud a court of equity will not sanction, but will affirmatively, actively prevent, decreeing completion of the contract, none of the other essentials to specific performance being wanting, and no effectual matter in rebuttal being set up or proved. Our cases on the subject of part performance of verbal contracts for the sale of land have been quite numerous. In *Gallagher* v. *Gallagher*, 31 W. Va. 9 (5 S. E. Rep. 297); Judge SNYDER has clearly and accurately summed up the doctrine, and placed it on its true foundation of estoppel against the commission of a fraud by the vendor, such estoppel to be affirmatively enforced in a court of equity in favor of the vendee. See, also, 2 Minor, Inst. 854; *Wright* v. *Pucket*, 22 Gratt. 370.

I have been at some trouble in gathering up our cases on the subject. Some of them are very instructive. (See the many discussions by Judge Carr and Judge Tucker, who had been judges of the old Chancery Court. I give them

here for convenient reference.) *Rose* v. *Nicholas* (1794) Wythe, R. 59; *Rowton* v. *Rowton* (1806) 1 Hen. & M. 92; *Argenbright* v. *Campbell* (1808) 3 Hen. & M. 144; *Henderson* v. *Hudson* (1810) 1 Munf. 510; *Jackson* v. *Cutright* (1817) 5 Munf. 308; *Zane* v. *Zane* (1819) 6 Munf. 406; *Wilde* v. *Fox* (1822) 1 Rand (Va.) 165; *Anthony* v. *Leftwitch* (1825) 3 Rand. (Va.) 238 (a leading case); *Vail* v. Nelson (1826) 4 Rand. (Va.) 478; *Heth* v. *Wooldridge* (1828) 6 Rand. (Va.) 605; *Darlington* v. *McCoole*, 1 Leigh, 36; *Payne* v. *Graves*, 5 Leigh, 561; *Williams* v. *Lewis* (1834) *Id.* 686. See *Pigg* v. *Corder*, 12 Leigh, 69; *Parrill* v. *McKinley*, 9 Gratt. 1; *Patrick* v. *Horton*, 3 W. Va. 23; *Purrill* v. *McKinley*, 6 W. Va. 67; *Vickers* v. *Sisson*, 10 W. Va. 12; *Flemming* v. *Holt*, 12 W. Va. 144; *Tracy* v. *Tracy's Heirs*, 14 W. Va. 243; *Baldenberg* v. *Warden*, *Id.* 397; *Oil Co.* v. *Vinal*, *Id.* 639; *Lorentz* v. *Lorentz*, *Id.* 761; *Tnyder* v. *Martin*, 17 W. Va. 276; *Pack* v. *Hansbarger*, *Id.* 313; *Lydick* v. *Railroad Co.*, *Id.* 427; *Middleton* v. *Selby*, 19 W. Va. 167; *Campbell* v. *Fetterman's Heirs*, 20 W. Va. 398; *Renick* v. *Ludington*, *Id.* 513; *Ballard* v. *Ballard*, 25 W. Va. 470; *Westfall* v. *Cottrills*, 24 W. Va. 763; *Steenrod's Adm'r* v. *Railroad Co.*, 27 W. Va. 1; *Kimmon's* v. *Oldham*, *Id.* 258; *Gallagher* v. *Gallagher*, 31 W. Va. 9 (5 S. E. Rep. 297); *Blankenship* v. *Spencer*, 31 W. Va. 510 (7 S. E. Rep. 433); *Frame* v. *Frame*, 32 W. Va. 463 (9 S. E Rep. 901); *Boggs* v. *Bodkins*, 32 W. Va. 566 (9 S. E. Rep. 801); *Harrison* v. *Harrison*, 36 W. Va. 556 (15 S. E. Rep. 87.)

Was the verbal contract set up in the bill thus partly performed by such notorious and exclusive actual possession given and taken and held under it and unequivocally referable to it, as the doctrine on the subject requires? Perry Lorentz had left to him, as owner, at the place in question, twenty six acres, according to the contention of defendants, but seventeen acres according to plaintiff, there being about nine acres in dispute, which constitutes what is called the "interlock," which plaintiff claims under the Bush deed.

The depositions of thirty eight witnesses were taken on the two sides, but it would not serve to elucidate the question of actual possession to go over it in detail, even if it

could be made intelligible. On this point, therefore, I must content myself with a general statement of conclusions reached, without verification by reference to the testimony relied on. The evidence does not show with satisfactory certainty that plaintiff ever had actual possession proper of the seventeen acres, or of the nine acres, by any of the usual visible permanent marks of ownership. No part of the seventeen acres was cleared, no part of it fenced. There was some evidence tending to show that at some time plaintiff had made through it a kind of brush fence from the fence of a neighbor's tract of land on the far side, through the woods, down the hill towards the fence on plaintiff's Bush tract; but the evidence fails to show that this obscure and perishable fence was ever run far enough to complete the inclosure, how long it lasted or for what purpose it was made or commenced; and, at best, it was very obscure and evauscent, and could not have had the effect to keep plaintiff's cattle in or other people's cattle out. No part of it was cleared or cultivated, except about three fourths of an acre, which I infer was on the nine acre part, and was plainly referable to his claim under the Bush deed, for it was made in 1863—twelve years before he bought of Perry Lorentz; and that was not kept up; and, if it had been it is well settled, that "a possession which can be referred to a title distinct from the agreement will not take the case out of the statute." 1 Sugd. Vend. 228. The mere cutting of timber, or the exercise of other temporary and intermittent acts of ownership of like kind, have been held to be insufficient. Such mere transitory acts of ownership are not sufficient; it must be something continuously visible. As to the coal bank for domestic use, Perry Lorentz used that down to his death, on July 4, 1887, and while using it offered to sell the piece of land to others, although plaintiff introduced some evidence tending to show that such use was with plaintiff's permission.

After saying the most that can be said for plaintiff's case on this vital point, we are left in too much doubt to say with sufficient certainty that actual possession was, with the consent of the vendor, taken and held under his verbal contract. Not until after the death of Perry Lorentz did

plaintiff take of the seventeen acres—what may be termed the "scrambling, litigious possession," which defendant Allman attempted to interrupt, and which led to the bringing of this suit. But that was twelve years after the verbal contract. Perry Lorentz was no longer in life to deliver possession, or to assent to plaintiff's taking it. The sole heir, Maggie Lorentz, expressly dissented, denying the sale, and plaintiff's right; and through her agent, L. L. Lorentz, made a sale to defendant Nathan Allman. Although such taking possession may be an assertion of his claim, no one could be estopped, and proof of the verbal contract set up in his bill could have no effect.

But it is urged that this is an exceptional case. Plaintiff has paid all the purchase-money, and the vendor has died insolvent. It is true, courts of equity have never tied themselves down by any inflexible rule as to what is a sufficient part performance, or held that the giving and taking of actual possession is in all cases indispensable; but they have repeatedly held that the payment of the purchase-money is not of itself sufficient, although the vendor has become insolvent. It is, in one view, full performance on the part of the purchaser, but in its very nature it does not point unequivocally to or presuppose some contract of sale of land. It can of itself have no such definite, specific meaning or effect. And for the still stronger reason, being merely an executory contract—a mere chose in action—the injury for the breach of it may, in general, be compensated in damages; but it creates no equitable interest in the land itself, and can create no equitable estoppel against the vendor, based upon his visible dealing with the vendee in regard to the land. Pom. Cont. § 113; *Gallagher* v. *Gallagher* (1888) 31 W. Va. 9 (5 S. E. Rep. 297); *Jackson* v. *Cutright* (1817) 5 Munf. 308; *Clinan* v *Cooke* (1802) Sch. & Lef. 22, 40.

If plaintiff's case had been made out, the law has long been settled that it may be met and overcome by a counter equity, proved by parol. As plaintiff's equity rests on parol evidence, there can be no question it may be rebutted by parol evidence.

The evidence shows that soon after the death of Perry

Lorentz, on July 4, 1887, defendant Maggie Lorentz, his sole heir, was negotiating the sale of this land to defendant Allman. ·Her cousin, L. L. Lorentz, was at her house, "helping her to straighten up her business. She spoke of this piece of land, and told him to sell it for her. L. L. Lorentz mentioned that he had heard that plaintiff, James W. Miller, had bought it, and said he would see Miller on his way home. She said it was not nececssary, for he had not bought it." He did, however, speak to Mr. Miller about it, telling him that he had understood that he had bought this land on the mountain. Plaintiff said in reply "that he had [bought it], and had paid for it in wheat, sawing, and one thing and another; but that woman [Maggie Lorentz] has seen a great deal of trouble. I have nothing to show that I bought this land. Go ahead and sell it." He told plaintiff that Maggie Lorentz was desirous of selling that land, but that if he (plaintiff) had bought the land, and paid for it, he ought to have it. Plaintiff replied it was not worth much, and he would not put her to any more trouble about it; but when it was sold he would like to have enough of it to straighten the line up the hill. Soon after this, L. L. Lorentz sold the land to defendant Nathan Allman for one hundred and forty three dollars, as the agent of Maggie Lorentz, and she conveyed the same to Allman by deed dated November 5, 1888. Mr. Miller denies this conversation, but says that he proposed a compromise line through the tract. Defendant Allman says that witness L. L. Lorentz told him (Allman) that defendant Miller had told him to sell the land, and that he bought it; and that, after he had made the purchase, and they were surveying the land in May, 1888, Mr. Miller came to where he was surveying, and said that his Bush deed covered it; but, after Mr. Higginbotham had talked with him, he didn't think he could hold it (under his Bush deed), but that he had bought it (of Perry Lorentz), and paid two dollars and fifty cents an acre, and would still pay two dollars and fifty cents, if they would let him have it. This would not present the question of a purchaser for value without notice, but of equitable estoppel, giving up his claim to Maggie Lorentz, telling her to sell it, and a sale made by

her to defendant Allman ; both acting on what plaintiff said.

Taking this as true, his equity was rebutted. His claim, if any was without writing, as he said. It could only be proved by parol. He withdrew his claim, and told Maggie Lorentz to sell. This was communicated to Allman, and he bought it. 2 Story, Eq. Jur. § 769 ; 2 Beach, Mod. Eq. Jur. § 1113. It was only an abandonment of his claim, but an abandonment, upon which the vendor and subsequent purchaser were induced to act. The bill alleges that this verbal contract was made in 1875. Perry Lorentz, the vendor, died on July 4, 1887, and this suit was brought on March 7, 1889—fourteen years after the verbal contract was made.

Counsel for defendants insist that, in any view of the case upon its original merits, plaintiff has too long delayed the institution of his suit. He has slept upon his rights too long. His claim is stale. If the plaintiff had been in actual possession of the Lorentz land, in the exercise and assertion of his claim of purchase, while his possession under his incomplete equitable title would not be adverse to the vendor, yet the lapse of time would not, as a general rule, have prejudiced his right to sue for its completion, because, in the case supposed, the contract had been on his part fully completed by the payment of the purchase price ; and he had taken and held the possession with the vendor's consent, with no one in default but the vendor himself, who had failed or neglected to complete the contract on his part by the conveyance of the legal title. *Seton* v. *Slade*, 2 Lead. Cas. Eq. p't 2, p. 1137 ; *Tracy* v. *Tracy's Heirs*, 14 W. Va. 243. But, being of opinion that the plaintiff wholly fails to make it clear by a preponderance of evidence that he had such actual, continuous, visible possession of the Lorentz land outside of what he claimed under his Bush deed as to satisfy the requirement of part performance, and having on that point failed to make out his case, it is not necessary to consider his long delay in bringing his suit, and his putting it off until two years after the death of the vendor.

Thus far I have not considered the evidence produced by

plaintiff to prove the verbal contract of sale. No one appears to have been present except the two contracting parties. Perry Lorentz, the vendor, was dead before suit was brought, and therefore the vendee, Miller, could not be examined, or, if examined, his evidence can not be considered in regard to such personal transaction and communication ; so that it has to be made out entirely from what Perry Lorentz said to others upon the subject. That he regarded all or some of this land as virtually sold to plaintiff, and expected to consummate a sale by a conveyance, I think is fairly made out. That there was some unsettled element in the sale in Perry Lorentz's opinion, which prevented or delayed the conveyance, is a reasonable inference. There is nothing to fix the date of the sale with any precision, nor the price. In the dealings between himself and plaintiff, he regarded the purchase-money as wholly or substantially paid. Some time in 1886, Surveyor Peterson surveyed for Perry Lorentz a piece of land near this, and adjoining the land of Wilson and Stalnaker, which adjoining piece Lorentz had sold them ; and at the same time he had Mr. Peterson to survey a part of the land in controversy, saying he wanted to make a deed for it—for that part, the surveyor inferred, lying above the railroad ; but he did not say to whom. If the railroad runs with the turnpike, this would include the twenty six acres. If it excluded the nine and three fourths acres which the plaintiff claims under his Bush deed, then it would be the sixteen and one fourth acres as plaintiff claimed it in his bill.

Without going over the evidence in detail I gather from the whole of it that both the boundary and the price had not been definitely fixed to the satisfaction of Perry Lorentz, and hence the delay in making the deed. Both these Mr. Lorentz expected no doubt to agree upon with the plaintiff, and then make the deed; but he died, leaving it undone. The deed dated November 5, 1888, from Maggie Lorentz to defendant Nathan Allman, for twenty six acres, includes the nine and three fourths acres which plaintiff claims under his deed from Jacob Bush.

Plaintiff (*inter alia*) alleges that he has had actual pos-

session of the nine and three fourths acres, claiming it under his Bush deed, for thirty years, and is still in actual possession, and therefore can not bring an action of ejectment against defendant Allman; but that his deed from Maggie Lorentz is a cloud upon his title to the nine and three fourths acres, and may be used to injuriously and vexatiously embarrass him, and disparage his title, and that the same may be removed, *etc.* Taking the case as plaintiff claims it, then the nine and three fourths acres tract is within the boundaries of his Bush deed and his title thereto. is legal. If plaintiff has it in actual possession, then he can not sue Allman in ejectment (unless he elects to treat himself as turned out by Allman's trespass); and in such case, having no remedy at law, he may resort to a court of equity to have the cloud removed. See *U. S.* v. *Wilson,* 118 U. S. 86 (6 Sup. Ct. 991); *Allen* v. *Hanks,* 136 U. S. 301, 311 (10 Sup. Ct. 961); 3 Pom. Eq. Jur. (2d Ed.) § 1399, and cases cited; *Jones* v. *Neale,* 2 Pat. & H. 340; *Carrington* v. *Otis,* 4 Gratt. 235, 252. See *Clayton* v. *Barr,* 34 W. Va. 290 (12 S. E. Rep. 704.)

But the case has not been prepared with reference to settling this branch of it. Actual possession proper, as we have seen, was necessary to be taken of the whole or a part of the land bought from Perry Lorentz to constitute such taking of possession as to be a part performance; whereas constructive actual possession may be sufficient under this branch of the case, possession of a part being possession of the whole when there is nothing to qualify or limit it. So the question of whether the lines of the Bush deed do in fact embrace the nine and three fourths acres, or whether, if they do not, plaintiff has had actual possession proper up to the lines as he claims them, and how long, these and other questions necessary or material in passing upon this branch of the case can not be determined by this record, and in the view taken by the Circuit Court, there was no occasion for determining them.

The Court in conclusion, holds that plaintiff has not shown himself entitled to a specific execution of the verbal contract for the sale of the twenty six acres of land in the bill and proceedings mentioned, but this is not in any wise

to affect any right or title he may have to said nine and three fourths acre tract.

Therefore the decree of the Circuit Court of the 24th day of October, 1892, must be reversed, and the cause remanded, there to be further prosecuted by plaintiff for the removal of the cloud on his title, if any, as to the nine and three fourths acres, or to be dismissed without prejudice in that regard, as plaintiff may elect.