# CHARLESTON.

MOORE v. MUSTOE et al.

Submitted February 1, 1900—Decided March 24, 1900.

1. RESULTING TRUST—Control—Purchase.
   A resulting trust must arise at the time of the contract of purchase by virtue of the payment of the purchase money from the funds of the cestui que trust, or securing the same at that time to be thereafter paid, so as to make them a part of the contract of purchass. (p. 552).

2. EXPRESS TRUST—Equity—Enforcement.
   An express trust will be enforced in equity where possession is held of, and valuable improvements are made on, the trust property by the cestui que trust, in pursuance of the contract of purchase (p. 552).

Appeal from Circuit Court, Randolph County.
Bill by Clara A. Moore against A. Mustoe and others. Decree for defendants, and plaintiff appeals.

*Reversed.*

A. B. PARSONS, for appellant.
E. D. TALBOTT, for appellees.

DENT, PRESIDENT:

This is a suit from the peaceful shades of Randolph County, instituted by Clara, intermarried with Eli Moore, of Montrose, against her pa, the Reverend Anthony Mustoe, of Breitz, near the happy land of Canaan, the neighboring county of Tucker. Clara's story is as follows: Eli's creditors becoming importunate, he found it necessary to make an assignment for their benefit. In this assignment he included an item of five hundred dollars for her, which she had no knowledge of; also a note for six hundred and thirty dollars in favor of her pa, which, however, was to be for her benefit. The circuit court, on application of the other creditors, struck out the five hundred

dollar item, without resistance on her part, but allowed the six hundred and thirty dollars in favor of her pa, and decreed the lands of Eli for sale. That her pa agreed to purchase for her at such sale three certain tracts of land, and did purchase them, to wit: A seventy-six acre tract, at the price of two hundred and sixty-nine; a seventy five acre tract, at the price of two hundred and fifty-five dollars, and a one-half acre lot, at the price of two hundred and thirty-one dollars,—aggregating seven hundred and forty-five dollars. On this amount the six hundred and thirty dollar note was to be credited, and the residue pa was to take in timber, tan bark, and rent. But, he becoming for some reason dilatory, she decided pa must toe the mark. So she sought the aid of a court of equity to bring him to time, and compel him to hand over the deed. Eli, like a faithful helpmeet, seconds her motion to the extent of his skill and ability. He says he knew creditors always wanted something to kick at, so he put in the five hundred dollar note to furnish them the necessary exercise. The six hundred and thirty dollar note, in the name of Clara's pa, was a bluff note; but the old gentleman had, much to his surprise, called him one better, and got away with the whole of his frugal savings, from his greedy creditors. A mere breach of trust, not fraud in law. *Currence v. Ward*, 43 W. Va. 368, (27 S. E. 329). Eli entered the contest badly disfigured. The backbone of his evidence had been broken by the obstruction put in its way in the execution of the deed of trust and the note under seal; solemn acts which cannot be easily explained away, and by which he is estopped from telling the truth, —not a great hardship on Eli. In addition, a number of his neighbors, notably among them two of his brothers-in-law, pa's sons, who are in a position to know, say his reputation for truth and veracity is not the best, and they do not hesitate to declare that they would not believe him under oath. Pa certainly could not induce the boys to swear thus falsely for the purpose of cheating their sister, even though Eli intimated in his evidence that pa had been guilty of forging his valuable name to some small notes. It is due to Eli to say, however, that a greater number of his neighbors have absolute confidence in his capacity to tell the truth, because they

do not know that he was ever caught in a lie. Pa Mustoe, with a few essential variations, tells about the same story as his dutiful children. He says he agreed to buy the lands in for Eli at the commissioner's sale on the representation by him that he had saved some money out of the assignment to pay for the same. After the lands were knocked down to him, he told Eli to show up. Eli, instead of doing so, wanted him to give a note, and he would sign it, and raise the money in that way. But pa was too well acquainted with Eli's note-paying ability to be caught napping. So he told Eli he would raise the money to pay the down payment, and he could pay it back to him, and meet the deferred payments, and then he could have the lands. Eli failed to meet the deferred payments, and the commissioner brought suit, and obtained a new decree of sale, and pa Mustoe, having realized about three hundred and sixty dollars out of the six hundred and thirty dollar bluff note, raised the remainder, paid up the purchase money in full, and took a deed for the property. The evidence tends to show that while pa Mustoe does a little preaching, trying to gather the lost sheep into the fold, and has one eye on the pearly gates, where the wicked cease from troubling and the weary are at rest, he keeps the other to windward in an endeavor to make friends with the Mammon of unrighteousness. While trying to serve two masters, he gives his present allegiance to the one he can see, taste, hear, feel, and smell, and puts the other off with a little preaching and the promise of a more convenient season. He says that he bought the lands for Eli, but several witnesses, bidders at the sale, say that he came to them during the bidding, and persuaded them not to continue bidding against him, as he was buying the lands for his daughter Clara. And they stopped, and let him have them, because there was a woman in it. He acknowledges that his son had him arrested, and thrown in jail, like poor old Bunyan, charged with burning down his own barn. He has not money enough to furnish a good consideration for the bluff note, and admits that ninety-seven dollars and ten cents was paid him by Clara through Eli to go on the land. He appears to have stumbled onto the truth here, and afterwards tries to correct himself, under the coach-

ing of his counsel. He is probably a little absent-minded. He makes a big effort to outswear several other witnesses in the case. His attainments in this direction will hardly win him a crown as a faithful servant when he presents his credentials at the golden gate of the New Jerusalem. The Good Book saith there is a place without· for whosoever loveth and maketh a lie, and they shall in no wise enter therein. Though his prospects for a mansion beyond are uncertain, he has possession and title to the lands here. He would rather dwell in the tents of the wicked than be a doorkeeper in the house of the righteous. Equity never helps those engaged in fraudulent transactions, but leaves them where it finds them. Therefore the money that Eli succeeded in bluffing his creditors out of must remain the money of his trusted father-in-law,. He justly punishes Eli by keeping it. The fowler is caught in his own snare. He could not possibly permit his daughter to be the beneficiary of such a fraudulent transaction. It would not become a minister's daughter. So, he will just apply the money to the indebtedness of Eli, acknowledged by his note. With Clara it is somewhat different. She must suffer for the company she keeps. Yet the sins of both father and husband should not be imputed to her. Woman has always been a favorite with equity, and it always throws its willing arms around her to protect her from the importunity and duress of her impecunious husbands. See opinion of JUDGE BRANNON in case of *Schamp* v. *Association*, 44 W. Va. 50, (28 S. E. 709). A resulting trust cannot be implied in her favor, for the reason that her money was not used at the time of the purchase or entered into the consideration therefor. Nor was it paid thereafter in pursuance of such purchase. *Myers* v. *Myers* (W. Va.; decided at this term) 35 S. E. 868; *Webb* v. *Bailey*, 41 W. Va. 463, (23 S. E. 644). Nor can the express trust be enforced so far as the two tracts of land are concerned, for the reason that her pa relies on the statute of frauds, and his contract with Eli was nothing more than an option withdrawable at any time before acceptance. *Eclipse Oil Co.* v. *South Penn Oil Co.*, (W. Va.) 34 S. E. 923. When a man only preaches a little, and undertakes to deal in the transitory things of this life, it is well always to have writings

with him, as memory is one of the worldly things that may be counted uncertain. It is not to be trusted, for it is easily overcome by self-interest. With the house and one-half acre lot it is different. She has been in continual possession thereof since the sale, claiming it as her own, and has put valuable improvements thereon. It is true pa says he advised her not to do so, through fear that she might not be able to pay the purchase money. In the light of the evidence, pa cannot be believed unless he is corroborated. On this point he lacks corroboration. The boys were absent. Besides, he acknowledges, as heretofore shown, to having received the ninety-seven dollars and ten cents to be applied on his daughter's purchase. If pa is to continue preaching,—and it is to be hoped, for from the conduct of this suit and the testimony of the witnesses Eli is not the only one in need thereof,—he should cultivate a greater regard for the truth, and try to overcome his lust for the fleshpots of Egypt. It is bad advice that Stout sent to Eli to betake himself to a warmer country, and it is not wise for pa to take it. A rich man, who chose a home there once, sent back word, when he found the climate was sultry, the air impregnated with the fumes of brimstone burning, the society not select, and water scarce and more to be desired than the gold standard, that he longed for the companionship of poor Lazarus, to whom he had denied the crumbs that fell from his sumptuous table. He pleaded for a new trial and change of venue, which being refused, he asked that his brother be notified that the country was not a desirable place for a permanent location. Rather than accept Stout's advice, it had been better had he remained in jail until he mastered the Pilgrim's Progress, and learned how to get rid of the heavy loads which are preventing the full consecration of himself to his chosen calling, than which there is none higher. If he is going to despoil anybody, it should not be those of his own household. With them, at least, he should be just.

As to this one-half acre lot, pa must be held to be the holder of the legal title in trust for Clara. *Potts* v. *Fitch*, (W. Va.) 34 S. E. 959; *Camden* v. *Dewey*, *Id.* 911. The decree complained of must therefore be reversed, and this cause is remanded to the circuit court, with direction to

secure to Clara, the wife of Eli, the legal title to the one-half acre tract, retaining thereon a lien for any unpaid purchase money, if her pa exacts it, subject to the credit of ninety-seven dollars and ten cents, with interest and the costs of this suit, and any other just demand she may show herself entitled to, except the "bluff" money, which, if not really belonging to pa, coming from a corrupt source would pollute her otherwise chaste home.        Reversed and remanded.

*Reversed.*